**Henry C. MINCHIN, Petitioner,**
v.
**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 291, Docket 28508.

United States Court of Appeals
Second Circuit.

Argued April 22, 1964.

Decided July 20, 1964.

Israel Machtey, New York City, for petitioner.

Edward L. Rogers, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, on the brief), for respondent.

Before LUMBARD, Chief Judge, and WATERMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This case presents the familiar question whether amounts paid as "interest" to a life insurance company which issued a single-premium annuity policy to the taxpayer, and then proceeded to "loan" him back amounts up to the cash or redemption value of the policy without any other security or recourse on the note, are deductible under sections 23(b) of the Internal Revenue Code of 1939 and 163.(a) of the 1954 Code. Or, as the Supreme Court put it in Knetsch v. United States, 364 U.S. 128, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), did the transaction between the taxpayer and the insurance company create an "indebtedness" within the meaning of the statute? Finding no significant difference between this case and Knetsch, we affirm the Tax Court's judgment that it did not.

On May 20, 1953, the Commercial Benefit Insurance Company, of Phoenix, Arizona, issued to petitioner two identical annuity contracts, each of which provided for 120 monthly payments of $2400 each, to commence ten years after the date of execution of the contract. The consideration stated in each contract was the payment of $200,000. However, Minchin made no payments at that time. On July 17, 1953, he gave to the company two demand negotiable promissory notes, each in the amount of $200,-000. Thereafter, on July 20, 1953, he borrowed $211,151.25 from Commercial on each contract, giving as sole security the contracts themselves. He then executed two contract loan agreements, which required him to pay interest at 4% for two years in advance. The cash value of each of the contracts on May 20, 1955 was $211,145.48. Commercial thereupon cancelled the two notes, and gave petitioner two checks in the sum of $11,151.25 each. Petitioner then gave Commercial two checks in the sum of $15,930.05 each, representing the "interest" payment on each loan until May 20, 1955. He deducted the sum of $31,860.10 on his income tax return for the year 1953.

Some time prior to December 20, 1954, all of Commercial's rights and obligations under the annuity contracts were assumed by the United Guaranty Life Society. On that date, although the 1953 loans still had five months to run, petitioner executed a new, two-year contract loan agreement with United for the period up until May 20, 1957, and renewable thereafter. Like its predecessors, this agreement called for a loan of close to the contract's cash value on May 21, 1957 (the loans were for $222,-750 each, cash value would have been $222,918.19 each), and for pre-payment of interest. United cancelled the earlier loan agreement, and gave petitioner two checks for $11,598.75 each; petitioner gave United two checks of $17,575.04 each for the pre-payment of interest, and deducted these amounts, less a refund of $369 from United, on his income tax return for 1954. The new loan agreements provided for a gradually decreasing rate of interest after the sixth contract year, and also gave the contract holder the right to defer payment of the loan until just before the maturity date, under certain conditions.[1]

From the foregoing, it will be seen that petitioner's borrowings against the policy kept its cash surrender value to a minimum or even negative amount, that in economic terms the transaction gave him for the years in question, an actual loss, since the interest charges were considerably higher than the increase in cash value over the period of the loans, and that, for a total cost to him of $9,557.60 in 1953, and $11,-583.58 in 1954, deductions of $31,860.10 and $34,781.08 respectively were secured. These facts, we think, make it impossible to consider Minchin's transactions with the insurance companies as having any substantial economic effect. Knetsch v. United States, supra; Carpenter v. Commissioner, 322 F.2d 733 (3 Cir. 1963); Pierce v. Commissioner, 37 T.C. 1039 (1962), aff'd 311 F.2d 894 (1962); Diggs v. Commissioner, 281 F.2d 326 (2 Cir.), cert. denied, 364 U.S. 908, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Weller v. Commissioner, 270 F.2d 294 (3 Cir. 1959). Cf. Jockmus v. United States, 2 Cir., 335 F.2d 23.

It is true that the arrangement under consideration here lacks some of the more outrageous features of the Knetsch case, supra. Thus, the annuity was deferred for only ten years, and it seems that, if petitioner followed through on the 1954 contract, and paid the full amount of the loans due before the maturity date, he would have received an annuity for considerably less cost than would otherwise be available to him at that time. But there was no indication in the record whether petitioner did take this step. Moreover, petitioner's attempt to analogize this type of transaction to buying stocks on margin and paying for them after their value increases misses the mark, since the annuity contract here had a fixed value beyond which it could not increase. When all is said and done, the practice of paying four percent annual interest to obtain an increase of 2.75 percent in value demands a rather convincing explanation if it is to be deemed to have economic reality. The explanation here, though it is vigorously pressed, does not meet that test.

Petitioner's last contention is the well-worn and often-rejected one that he was entitled to rely on certain unpub-

1. The contract loan agreement with United provided as follows:
"Upon any anniversary subsequent to the second anniversary of the date of issue of the annuity contract hereby assigned upon request of the annuity owner, the Company will stop the 2¾% annual accumulation and reduce the loan interest to ¼₆ of 1% annually in advance, but not beyond the retirement date, provided the owner agrees that the 'Basis of Reserve' paragraph of said annuity shall be amended to read as follows: 'The reserve to be held upon this contract shall be the then present value at retirement date of 120 monthly payments certain commuted at 2% per annum, without discount for the period from the effective date of such reduction in loan interest to the retirement date.' "

lished letter rulings to other taxpayers, issued before he undertook the transaction in question, which stated that arrangements of this type would qualify for the interest deduction. These rulings were all revoked by Revenue Ruling 54–94, 1954–1 Cum.Bull. 53. It has always been held, in similar situations, that taxpayers other than the ones to whom the rulings were issued could not rely on them. See Carpenter v. Commissioner, supra; Weller v. Commissioner, supra; Goodstein v. Commissioner, 267 F.2d 127 (1 Cir. 1959). In the light of Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), we must certainly follow this authority. Petitioner's contention that Revenue Ruling 54–94 has been unequally applied because it was given prospective effect only in Rufus C. Salley, T.C.Memo 1962–80, 21 T.C.M. 412, aff'd, 319 F.2d 847 (5 Cir. 1963) lacks weight, because the taxpayer in that case had himself received a private ruling. See Revenue Ruling 54–172, 1954–1 Cum.Bull. 394, 401 (Sections 12.-05, 12.06).

Judgment of the Tax Court affirmed.