W. Lee McLane, Jr., Petitioner, *v*. Commissioner of Internal Revenue, Respondent

Nola McLane, Petitioner, *v*. Commissioner of Internal Revenue, Respondent

Docket Nos. 4697–63, 4698–63. Filed April 29, 1966.

*Thaddeus Rojek*, for the petitioners.
*Francis J. Cantrel*, for the respondent.

Tannenwald, *Judge:* Respondent determined deficiencies in the 1958 Federal income tax of petitioner W. Lee McLane, Jr., of $10,073.19 and in the 1958 Federal income tax of petitioner Nola McLane of $10,075.86. The cases were consolidated for trial. The only issue for decision is whether certain amounts paid during 1958 are deductible as interest.

### FINDINGS OF FACT

Some facts are stipulated and are found accordingly.

Petitioners were husband and wife and resided in Phoenix, Ariz., during the year in issue. Their Federal income tax returns were prepared on the cash method of accounting and timely filed with the district director of internal revenue, Phoenix, Ariz. Since Nola is a party herein only by reason of Arizona's system of community property, any subsequent reference to petitioner shall mean W. Lee McLane, Jr.

From 1946 through 1958 petitioner was an attorney with a practice limited to tax matters.

In 1952 petitioner was first retained to give advice regarding the deductibility for Federal income tax purposes of interest payments on loans obtained pursuant to purchase of certain annuities. Subsequently, he represented several taxpayers involved in similar transactions (including the taxpayers in *Knetsch* v. *United States*, 364 U.S. 361 (1960), before the Supreme Court). He became aware of "private," but nevertheless well-publicized, rulings issued by respondent in 1952 to two separate taxpayers stating that interest paid and/or prepaid on certain loans used to purchase single-premium and multiple-premium annuities was deductible in the year of payment for cash basis taxpayers. In 1954 respondent publicly changed his position on single-premium annuities and ruled, in Rev. Rul. 54–94,

1954–1 C.B. 53, that interest paid on loans used for such purchases was not deductible. In another well-publicized private ruling issued that same year, respondent stated that Rev. Rul. 54–94 did not apply to the facts of the 1952 private ruling dealing with multiple-premium annuities.

Petitioner engaged in certain transactions with All Service Life Insurance Corp. (hereinafter referred to as All Service), which, *in form*, are as set forth in subsequent paragraphs.

On December 29, 1958, petitioner applied to All Service for the issuance of six "Retirement Life Annuities with Ten Years Payment Certain." The premium for each annuity was $210,000, payable $35,-000 each year for 6 years. Petitioner's certified check in the amount of $1,200 accompanied the applications, representing payment of $200 on account of the first annual premium of $35,000 for each policy.

On three of the policies, the annuitant was petitioner's daughter Martha Ann, who was just short of 11 years of age, having been born on February 16, 1948. On the other three policies, the annuitant was petitioner's daughter Susan Lee, who was just short of 7 years of age, having been born on February 9, 1952. Petitioner's wife, Nola, was the contingent beneficiary on all six policies.

All Service accepted the applications and on December 29, 1958, issued the six policies.

Also on December 29, 1958, pursuant to six loan agreements, All Service agreed to loan petitioner a total of $208,800, or $34,800 on each policy, with interest payable in advance at a rate of 3 percent per annum but discounted at the rate of 2.25 percent per annum, compounded annually, for interest paid more than 1 year in advance. Pursuant to petitioner's instructions, All Service applied the proceeds of each loan to payment of the balance of the first annual premium due on each of the six policies. At the same time, petitioner delivered to All Service a certified check in the sum of $35,576.10 in accordance with the provisions of the agreements requiring prepayment of 6 years' interest.

At the time that petitioner entered into the transactions with All Service in December 1958, he contemplated systematic borrowing of part or all of the cash values of the policies and use of the borrowed funds to meet the premiums thereon as they came due.

The cash surrender value of the six policies after payment of the first year's premiums was $215,588.70.

The reserve value of the six policies at the end of the first policy year was $215,775.

One week later, on January 5, 1959, All Service agreed to loan to petitioner a total of $37,824 (or $6,304 on each policy), pursuant to six loan agreements, each requiring the prepayment of 6 years' interest at the rate of 3 percent per annum, with interest paid for more than

1 year in advance discounted at the rate of 2.25 percent per annum, compounded annually. In accordance with petitioner's instructions, the entire proceeds of the loan were paid to him. Petitioner was able to borrow an amount in excess of the cash surrender value because of the credit to which he was entitled under the loan agreements for interest prepaid for the years subsequent to the first year.

On January 5, 1959, petitioner paid to All Service, by certified check, the sum of $6,422.76, representing prepaid interest on the loan of $37,824.

On November 19, 1959, All Service's books showed a credit to petitioner's account, as a consequence of the prepayment, of unearned, refundable interest in the amount of $34,622.04. On the same date, and less than 11 months after the policies were issued to him, petitioner surrendered all six policies to All Service for cancellation. All Service applied the cash surrender value of the policies in reduction of petitioner's loans secured by the policies. The remaining unpaid liability of petitioner was satisfied out of the unearned, refundable interest due him, and the remaining balance of the unearned, refundable interest, amounting to $3,557.22, was paid to him by All Service.

As of November 19, 1959, the date of the cancellation of the six policies, petitioner was "out of pocket" $1,817.64 as a result of these transactions.

At no time was petitioner or Nola McLane personally liable for either the payments of any premiums due on the six policies or for the payment of any funds allegedly borrowed to pay premiums and/or interest.

On the individual Federal income tax return filed by him for the calendar year 1958, petitioner claimed a deduction in the amount of $17,788.05 as "interest" paid to All Service. On the individual Federal income tax return filed by her for the calendar year 1958, petitioner Nola McLane claimed a deduction in the amount of $17,788.05 as "interest" paid to All Service. Respondent disallowed both of said claimed deductions.

In 1958 petitioner's purported purchase of the six policies from All Service, borrowing of funds from All Service, and payment of interest to All Service on such loans lacked substance and constituted sham transactions.

OPINION

With refreshing candor, petitioner appears to concede that the transactions involved herein lacked substance [1] and that in this respect

---

[1] The phrase most commonly used in the cases (and by the parties herein as well) is "economic substance"; it disregards the tax advantage which, of course, in the final analysis produces an economic or financial benefit.

this case is controlled by *Knetsch* v. *United States*, 364 U.S. 361 (1960), and *Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962), certiorari denied 373 U.S. 912. He argues, however, that, notwithstanding the absence of substance, Congress evidenced an intent to allow the deduction for interest under the circumstances involved herein for transactions entered into prior to August 7, 1963. Respondent asserts that the absence of substance is determinative. The parties have also locked horns on petitioner's claim that respondent has unfairly discriminated between him and other taxpayers similarly situated.

In order to justify his deduction for interest, petitioner has developed his arguments with the skill of a tightrope artist. Perhaps if petitioner were merely seeking to have us repair a hole in his safety net, his arguments would have some merit. We will not, however, manufacture the entire net, as petitioner would have us do.[2] The glove of *Knetsch* and *Pierce* fits petitioner's hand perfectly.

The history of the provisions dealing with the deductibility of interest on indebtedness incurred or continued to carry insurance reflects the constant "push" by Congress to keep abreast of the "pull" of ingenious schemes to take advantage of loopholes.[3] Congress spoke confidently in 1942 of closing a "loophole" through the enactment of the predecessor of section 264,[4] see H. Rept. No. 2333, 77th Cong., 2d Sess., p. 47, 1942–2 C.B. 372, 410, but it later found that taxpayers were accomplishing through the use of single-premium annuities what the 1942 provision had rendered unattainable through the use of single-premium life insurance and endowment contracts. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. 31 (1954) ; S. Rept. No. 1622, 83d Cong., 2d Sess., p. 38 (1954). Thus, in subsection (a) (2) of section 264, Congress in 1954 ended the tax benefit which had been obtainable through the use of single-premium annuities. Again, as in 1942, the "loophole-closing" of 1954 sired another loophole, this time in the form of multiple-premium annuities, and by 1956 Congress realized that the barn door had not been closed on this loose horse. Press Release, Subcommittee on Internal Revenue Taxation, House Committee on Ways and Means, Nov. 7, 1956; Hearings before Subcommittee of House Committee on Ways and Means on Technical Amendments to the Internal Revenue Code, 84th Cong., 2d Sess., pp. 325, 338–339 (1956) ; see also Hearings before Senate Committee on

[2] Cf. the opinion of Judge Aldrich in *Fabreeka Products Co.* v. *Commissioner*, 294 F. 2d 876, 879 (C.A. 1, 1961), reversing 34 T.C. 290 (1960) : "Granting the Government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's." Certainly this is no mandate to construct the dike itself.

[3] The creators of these schemes were apparently unaware of the admonition of Mr. Justice Holmes that "men must turn square corners when they deal with the Government." See *Rock Island &c. R.R.* v. *United States*, 254 U.S. 141, 143 (1920).

[4] All Code references are to the Internal Revenue Code of 1954.

Finance on H.R. 8381, 85th Cong., 2d Sess., pp. 35, 44 (1958). Finally, in the Revenue Act of 1964, Congress acted with respect to this problem by adding subsection (a)(3) to section 264 as follows:[5]

(a) GENERAL RULE.—No deduction shall be allowed for—

(3) Except as provided in subsection (c), any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance, endowment, or annuity contract (other than a single premium contract or a contract treated as a single premium contract) pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).

In discussing the scope of section 264 prior to the 1964 amendment, the Senate Finance Committee report stated:

However, under present law, no interest deductions are denied where the taxpayer purchases an insurance contract with the intention of borrowing the maximum amount on the contract each year, * * *

*       *       *       *       *       *       *

This provision [subsec. (a)(3)] is not to apply to a single-premium contract * * * since present law already denies a deduction in these cases. [S. Rept. No. 830, 88th Cong., 2d Sess., pp. 77, 78 (1964).]

See also H. Rept. No. 749, 88th Cong., 1st Sess., pp. 61–62 (1963); testimony of Secretary Dillon, Hearings on Revenue Act of 1964 before House Committee on Ways and Means, 88th Cong., 1st Sess., pp. 51, 110–112 (1963).

Subsection (a)(3) was expressly made applicable only to post-August 6, 1963, transactions.

Based upon the foregoing, petitioner by a tour de force concludes that: (a) The 1958 transaction herein is the type of abuse meant to be curbed by subsection (a)(3), but only prospectively; (b) the legislative history expressly confirms his assertion that the deduction flowing from this abuse was allowable under prior law; and (c) the "interest" involved herein is therefore deductible.

We agree with petitioners that the 1958 transaction *in form* fell within the class of transactions at which subsection (a)(3) was aimed.[6] But we do not agree with his assertion that the legislative

---

[5] Subsec. (c), which has no material bearing on this case, was also added.

[6] In order to fit the instant situation to that which Congress allegedly had in mind, petitioner and respondent have indulged in an esoteric argument as to whether petitioner had the appropriate intention in 1958 to engage in systematic borrowing. While we consider this argument wholly immaterial, we have nevertheless, in the interest of completeness, found that petitioner had such intention. In this connection, petitioner makes a further *curious* argument. Although he *insists* that his intentions must be taken into account for the foregoing purpose, he objects to our consideration of the post-1958 events which obviously implemented these intentions. We think these events are very material to the determination of the substance of the 1958 transaction and we have accordingly made appropriate findings with respect thereto. *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962), certiorari denied 373 U.S. 912.

history should be turned into an open-ended license applicable without regard to the substance of the transaction. Nor do we agree with the assertion that, if *Knetsch* and *Pierce* were controlling with respect to post-1958 multiple-premium annuities, there would have been no need for further legislation in 1964. *Knetsch* and *Pierce* involved transactions without substance. Congress, in enacting section 264(a)(3), struck at transactions *with* substance. It is a *reductio ad absurdum* to reason, as petitioner does, that Congress simultaneously struck down a warm body and breathed life into petitioner's cadaver.

We conclude that the presence of economic substance is still basic to claiming the benefit of a loophole. The building may not be constructed entirely from the tax advantage, but, if the foundation and bricks have economic substance, the economic or financial inducement of the tax advantage can provide the mortar.[7] *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 682 (1962).

Petitioner seeks nourishment from *Commissioner* v. *Brown*, 380 U.S. 563 (1965), and *United States* v. *Midland-Ross Corp.*, 381 U.S. 54 (1965). The gruel of these cases is too watery to provide petitioner with any sustenance, since in each instance the Supreme Court found that the transaction involved had substance.

Petitioner's final argument is an elaborate syllogism designed to prove that he has been unjustly discriminated against by respondent. He points to the following links in the alleged chain of discrimination:

(a) A 1952 private ruling issued to another taxpayer, but known by respondent to be widely circulated, which stated that interest was deductible when paid on a loan used to purchase a *multiple*-premium annuity.

(b) Rev. Rul. 54-94, 1954-1 C.B. 53, which stated that interest was not deductible when paid on loans used to purchase a *single*-premium annuity, and a subsequent widely circulated private ruling stating that Rev. Rul. 54-94 did not apply to the facts of the 1952 private ruling.

(c) Testimony in 1957 by the director of respondent's Tax Rulings Division before a subcommittee of the House Committee on Ways and Means that if the respondent became aware that a private ruling had been widely publicized any revocation of that ruling would be non-retroactive "across the board" and that a taxpayer who had relied thereon would be allowed a deduction for his "net out-of-pocket expense." Progress Report of the Subcommittee on Internal Revenue Taxation to House Committee on Ways and Means, p. 192 (1957).

(d) Petitioner, allegedly relying on the foregoing facts, entered into the transactions at issue herein in 1958.

---

[7] Cf. *Fribourg Navigation Co.* v. *Commissioner*, 383 U.S. 272 (1966). In that case the Government had not determined that the useful life adopted by the taxpayer did not reflect economic substance, and the Court held that depreciation was therefore allowable in the year of sale of the assets involved, even though the depreciation, in the economic sense, had not occurred during such year.

(e) Respondent has asserted deficiencies against petitioners by reason of the 1958 transactions but not against other taxpayers similarly situated.

Petitioner's argument proves too much. First, he cannot avoid the numerous decisions holding that one taxpayer cannot rely upon a private ruling issued to another under the guise of equality of treatment. See, e.g., *Bookwalter* v. *Brecklein*, 357 F. 2d 78 (C.A. 8, 1966); *Minchin* v. *Commissioner*, 335 F. 2d 30 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; *Bornstein* v. *United States*, 345 F. 2d 558 (Ct. Cl. 1965).

Second, petitioner's conclusion that the revocation by Rev. Rul. 54–94, *supra*, of the private rulings dealing with single-premium annuities (together with respondent's subsequent statement in a private letter that Rev. Rul. 54–94 did not apply to the facts of the 1952 private ruling on multiple-premium annuities) had the effect of validating transactions such as petitioner's is a *non sequitur*. The private letter specifically stated that it was only for purposes of general information.[8] The reference to the 1952 private ruling was specifically limited to the facts of that ruling. Neither the letter nor Rev. Rul. 54–94 can be read, for the purpose of supporting a claim grounded on unjust discrimination, to place the stamp of validation on the particular transaction engaged in by petitioner.

Finally, assuming without deciding that the statement of the director of the respondent's Tax Rulings Division [9] was an official statement of policy by respondent, it contains no indication that the private ruling allegedly relied upon by petitioner was revoked. The statement refers (a) solely to purchases of single-premium annuities, since Rev. Rul. 54–94 did not refer to multiple-premium policies, and (b) to a taxpayer who relied upon a ruling which had been revoked. Since petitioner does not fall within the class referred to, he cannot com-

---

[8] The letter, dated May 4, 1954, read, in part, as follows:

This is in reply to your letter * * * in which you call attention to the rulings contained in Rev. Rul. 54–94 * * * and [with regard to the requests for private rulings, referred to *supra*, on single- and multiple-premium annuities] request clarification of the rulings.

* * * this office is furnishing you the *following general information* on the subject of your inquiry, it being understood that *such information does not constitute a ruling on a specific item.*

The Rev. Rul. 54–94 * * * *does not apply to the facts stated* in the [1952 private ruling on the multiple-premium annuity]. * * *

(Emphasis added.)

[9] "Mr. SWARTZ. You are talking about the interest deduction with regard to annuities? * * * With reference to the nonretroactive application denying the interest deduction to people who relied on our private ruling, we were uniform in applying it [Rev. Rul. 54–94] nonretroactively to the extent we felt they had relied upon it to their detriment. In other words, we would allow them a deduction for the out-of-pocket money they had spent * * *. Our statement of policy with reference to nonretroactive application of a ruling is only where the taxpayer has relied on it * * *." (Progress Report of Subcommittee on Internal Revenue Taxation to House Committee on Ways and Means, p. 192 (1957).)

plain.[10]   In point of fact, the record herein is barren of any evidence that other taxpayers similarly situated were treated any differently. Compare *Bookwalter* v. *Brecklein, supra.*

Petitioner's case is clearly one of "overkill."   See *Commissioner* v. *Brown, supra* at 519.   *In form*, he purchased six multiple-premium annuities and paid interest on borrowed funds.   *In substance*, he purchased no annuities and borrowed nothing.[11]   Nothing beyond "commercial window dressing" was involved.   See *A. A. Helwig*, 37 T.C. 1046, 1052 (1962).   Respondent may always act on "plutological reality" as against "regularity of form."   See *Burde* v. *Commissioner*, 352 F. 2d 995 (C.A. 2, 1965), certiorari denied 383 U.S. 966 (1966).

*Decisions will be entered for the respondent.*

---

[10] It should also be noted that the 1952 private ruling relied upon by petitioner involves the deductibility of interest paid (a) on a bank loan which is used to prepay several years' premiums on a multiple-premium annuity and (b) to the issuer of the annuity in the event of transfer of the loan to the issuer.   Therefore, even if a taxpayer may, under some circumstances, use the issuance of a private ruling to another as the ground for a claim of unjust discrimination, compare *International Business Machines Corp.* v. *United States*, 343 F. 2d 914 (Ct. Cl. 1965), with *Bornstein* v. *United States*, 345 F. 2d 558 (Ct. Cl. 1965), because of the factual difference between the subject of the private ruling and the transaction herein, it is doubtful whether the petitioners could have reasonably believed that the ruling would control their transaction.   Cf. *Knetsch* v. *United States*, 348 F. 2d 932 (Ct. Cl. 1965), certiorari denied 383 U.S. 957 (1966); compare *L. Lee Stanton*, 34 T.C. 1 (1960), with *Amor F. Pierce*, 37 T.C. 1039 (1962), affirmed per curiam 311 F. 2d 894 (C.A. 9, 1962), certiorari denied 373 U.S. 912; see Lynn and Gerson, "Quasi Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies," 19 Tax L. Rev. 487, 509 (1964).

[11] If the annuities had been due and payable at the end of the first policy year, the situation would have been as follows: (a) The reserve value would have been $215,775; (b) the loans against the policies (after deducting the credit for prepaid interest) would have aggregated $215,064 (the original borrowing of $208,800 plus $6,264 representing interest thereon at 3 percent which was also borrowed); (c) All Service would have deducted the loans from the reserve values; (d) $711 would have been available for the payment of annuities.   This is even less than the $1,000 described by the Supreme Court as a "relative pittance" in *Knetsch*.   See 364 U.S. at 366.