GALE R. RICHARDSON AND GENEVIEVE RICHARDSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1204-74.    Filed July 23, 1975.

*Walter W. Petroski,* for the petitioners.
*David J. Duez,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined deficiencies in the amounts of $4,064.47 and $6,635.62 in petitioners' Federal

income tax for 1969 and 1970, respectively. The issues for decision are:

(1) Whether funds placed in trust by petitioner Gale R. Richardson's employer during 1969 and 1970 were properly taxable to petitioners during those years. The resolution of this issue, in turn, depends upon whether amounts transferred to the trust prior to August 1, 1969, were nonforfeitable within the meaning of section 402(b)[1] and whether the amounts transferred to the trust after that date were subject to a substantial risk of forfeiture within the meaning of sections 83(a) and 83(c)(1).

(2) Whether respondent is estopped from contending that such amounts were taxable in the years of transfer.

All the facts are stipulated.

Petitioners Gale R. Richardson (hereinafter petitioner, Dr. Richardson, or the doctor) and Genevieve Richardson, husband and wife, were legal residents of Minot, N. Dak., at the time they filed their petition. Petitioners timely filed their joint Federal income tax returns for 1969 and 1970, based upon the cash receipts and disbursements method of accounting, with the District Director of Internal Revenue at Fargo, N. Dak.

On January 1, 1967, Dr. Richardson entered into an employment agreement with St. Joseph's Hospital of Minot, N. Dak. (hereinafter the hospital), and that agreement, as modified, was in effect at all times relevant to this proceeding. The agreement provided for the following:

(1) Dr. Richardson would be responsible for the operation of the hospital's pathology laboratory.

(2) The compensation paid Dr. Richardson would be determined according to a percentage of the fees charged for most laboratory services rendered by the hospital.

(3) Dr. Richardson would be allowed to engage in the practice of pathology outside the hospital.

(4) Dr. Richardson would be granted use of the hospital facilities for purposes of doing referral work for which he would collect fees and remit an agreed percentage to the hospital to cover its laboratory maintenance costs.

(5) Dr. Richardson would receive a monthly payment of $\frac{1}{12}$ of his estimated annual earnings of fees collected by the hospital.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

On May 1, 1969, the agreement was modified by an Amendment to Contract of Employment, which provided a deferred-compensation arrangement. Under this arrangement, a portion of the compensation otherwise payable to Dr. Richardson, in the amount of $1,000 per month, would be paid instead to the First National Bank of Minot, N. Dak. (hereinafter Minot bank), as trustee. On the same day, a trust agreement was entered into between the hospital, as settlor, and the Minot bank, as trustee. The trust agreement provided generally that the funds withheld from each monthly payment to Dr. Richardson by the hospital, in accordance with the terms of the May 1, 1969, Amendment to Contract of Employment, would be held in trust by the Minot bank for the benefit of any person, corporation, or trust designated by Dr. Richardson, and in the absence of any designation by him, Dr. Richardson would be the beneficiary, with disbursements to be made upon Dr. Richardson's death, retirement, or separation from the service of the hospital. The agreement contemplated that 50 percent of the funds would be invested in an insurance and annuity contract on the doctor's life and the remainder in mutual fund shares.

The trust agreement contained a clause prohibiting petitioner from assigning any of the benefits provided by the trust and also provided that:

3.1 The doctor shall, during his lifetime and after termination of his Services and while his health permits, render to the Hospital such advice and counsel as the Hospital may reasonably and from time to time require but not such as would constitute full-time rendering of services. The Doctor shall not, after termination of his Services, absent himself from the continental limits of the United States for a period longer than three consecutive months in any one calendar year without the written consent of the Hospital.

3.2 For such advice and counsel as the Doctor may render in accordance with Section 3.1, he shall be compensated by the Hospital at the same rate as his cash compensation rate immediately before termination of his Services. In addition, the Hospital shall reimburse the Doctor for reasonable expenses actually incurred by him in rendering such advice and counsel.

On April 2, 1970, the parties executed an amended trust agreement, which, with respect to petitioner's rendering advice and counsel to the hospital after terminating his services, added the following language:

If, for any reason, without good cause, the Doctor shall after the termination of his services and while his health permits, fail and refuse to render such advice

and counsel, he shall, after due notice of said breach, forfeit all rights under this Agreement.

The amended agreement also provided that in the event of a revocation or termination of the trust,[2] all assets held by the trustee shall revert to the hospital, which shall administer and disburse the assets in accordance with the trust. While still other amendments were made, they are not material to the issue in controversy.

The hospital never received any advice and counsel from retired physicians during the tax years in issue, nor at any time prior thereto. And there is no evidence of record indicating any plan on the part of the hospital to institute a consultation program.

During the years in issue, the following amounts were paid to the Minot bank by the hospital for the benefit of Dr. Richardson:

| Year | Amount |
|------|--------|
| 1969 | $7,000 |
| 1970 | 12,000 |

On their joint Federal income tax returns for 1969 and 1970, petitioners did not report the $7,000 and $12,000, respectively, as gross receipts from Dr. Richardson's profession. In the statutory notice, dated November 21, 1973, respondent determined that such amounts were taxable as ordinary income to petitioners in the years the amounts were transferred to the trust.

The parties appear to agree that the Minot bank trust was not exempt from income taxes under section 501(a). Quite obviously, the hospital's monthly payments to the trust were an economic benefit to Dr. Richardson even if he did not have immediate access to the funds. *E. T. Sproull*, 16 T.C. 244, 247-248 (1951), affd. per curiam 194 F.2d 541 (6th Cir. 1952). Those payments are, therefore, taxable to petitioners when made unless there is some applicable Code provision which defers their taxability. We turn to section 402(b), which prescribes the rules for the taxability of beneficiaries of nonexempt trusts, and we find that section was amended by section 321(b)(1), Tax Reform Act of 1969, 83 Stat. 590, with respect to contributions to such trusts made after August 1, 1969. Since the hospital made contributions

---

[2] Only a breach by Dr. Richardson of his obligation to render advice and counsel after termination of services would serve to amend or revoke the trust.

to the trust both before and after that date, we must consider both versions of the section.

In the form applicable to contributions made prior to August 1, 1969, section 402(b)[3] provided that contributions to an employees' trust were includable in the employees' gross income "for the taxable year in which the contribution is made to the trust in the case of an employee whose beneficial interest in such contribution is nonforfeitable at the time the contribution is made." Section 1.402(b)-1(a)(2)(i), Income Tax Regs., defines the term "nonforfeitable" to mean there is "no contingency under the plan which may cause the employee to lose his rights in the contribution."

The revised version of section 402(b), which applies to payments to a trust made after August 1, 1969, provides that contributions to an employees' nonexempt trust "shall be included in the gross income of the employee in accordance with section 83 (relating to property transferred in connection with performance of services)." Section 83(a) provides generally that if, in connection with the performance of services, property is transferred to any person, the value of the property shall be included in the gross income of the person who performed the services in the first year in which such person's rights in the property "are transferable or are not subject to a substantial risk of forfeiture." Section 83(c)(1) defines a "substantial risk of forfeiture" as follows:

(c) SPECIAL RULES.—For purposes of this section—
(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

As we understand it, petitioner's whole argument on the merits is that the trust and employment agreements obligated Dr. Richardson to render substantial postretirement services, and his

---

[3] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.
(b) TAXABILITY OF BENEFICIARY OF NON-EXEMPT TRUST.—Contributions to an employees' trust made by an employer during a taxable year of the employer which ends within or with a taxable year of the trust for which the trust is not exempt from tax under section 501(a) shall be included in the gross income of an employee for the taxable year in which the contribution is made to the trust in the case of an employee whose beneficial interest in such contribution is nonforfeitable at the time the contribution is made. The amount actually distributed or made available to any distributee by any such trust shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities).

failure to render such services would cause a forfeiture of his rights under the trust agreement. On this ground, petitioners claim the trust deposits are not taxable in 1969 and 1970. We do not agree.

The employment and trust agreements and their amendments are a hodgepodge of overlapping and inconsistent provisions which have been repeatedly modified in an apparent effort to defer the income tax on the doctor's compensation. As we read those documents, the moneys deposited with the Minot bank for Dr. Richardson's benefit were "nonforfeitable," within the meaning of the earlier version of section 402(b), and such moneys were not "subject to a substantial risk of forfeiture," within the meaning of section 83(a). We do not think the doctor's rights were conditioned upon the performance of substantial services within the meaning of section 83(c)(1). We base this conclusion on a consideration of the instruments in their entirety and the meager stipulated facts and circumstances surrounding their execution.

First, the moneys paid into the trust were actually derived from compensation otherwise receivable by Dr. Richardson, and he has shown no reason for subjecting them to a risk of forfeiture. The May 1, 1969, amendment to the contract of employment substituted a new paragraph in the section on remuneration. Prior to the amendment, the paragraph provided that: "The Pathologist shall receive from the hospital a monthly payment of one-twelfth of his estimated annual earnings." The May 1, 1969, amendment provides that, of the compensation payable to Dr. Richardson, "the Hospital shall deduct" the sum of $1,000 each month and pay it into the trust. The trust agreement of the same date recites that: "The Hospital, in order to enhance the compensation paid to the Doctor" has entered into the May 1, 1969, amendment under which "compensation ordinarily paid to the Doctor shall be paid to the Trustee." The trust deposits thus represented compensation for past or current services, not compensation for services yet to be performed. Cf. *Estate of James Max Harrison*, 62 T.C. 524, 530-532 (1974).

While there is no direct evidence on the point, we must infer from the available evidence that the trust was established at Dr. Richardson's request and direction. *Candido Jacuzzi*, 61 T.C. 262, 266 (1973); *J. H. McEwen*, 6 T.C. 1018, 1025-1026 (1946). Fifty percent of the entrusted funds was to be invested in an in-

surance contract on the doctor's life and the other 50 percent in mutual fund shares. At the doctor's death, the proceeds of the policy as well as the mutual fund shares are payable, subject to no stated conditions, to the beneficiary last designated by the doctor to receive benefits under the agreement.[4] These life insurance and mutual fund investment benefits, which were provided for the doctor's designated beneficiaries, are not subject to forfeiture, and their cost is income currently taxable to him. *Paul L. Frost,* 52 T.C. 89, 95-96 (1969); see also *David Centre,* 55 T.C. 16, 19 (1970); *Renton K. Brodie,* 1 T.C. 275, 282-284 (1942).

Second, under a section entitled "Optional Transfers,"[5] the original and amended trust agreement provided that in the event of the termination of the doctor's services for any reason, "including but not limited to termination because of his death or Disability, then anything herein to the contrary notwithstanding," the trustee could discharge its obligations under the

---

[4] Secs. 2.2 and 2.3 of the trust agreement are as follows:

2.2 *Death Prior to Termination*—In the event of the death of the Doctor prior to termination of his Services, the Trustee shall pay one of the following benefits to the Beneficiary, the selection to be at the discretion of the Trustee:

(a) Consecutive monthly payments commencing not later than 60 days after receipt by the Trustee of written notice from the Hospital of such death based upon and equal to, the sum of the amounts obtainable by the Trustee

(1) Through one or more optional modes of monthly settlement (to be selected by the Trustee), on the proceeds of the Policy; and

(2) Through one or more optional modes of monthly settlement (to be selected by the Trustee), on that portion of the funds invested in fund shares; and

(3) Through investment of the balance of the Fund (after application of paragraph (2)) in a single premium immediate life annuity (one for each beneficiary), 120 months certain, on the life or lives of the Beneficiary or Beneficiaries. The selection of the insurance company to issue such annuity shall be at the discretion of the Trustee.

(b) A single payment equal to the sum of the amount obtainable by the Trustee under the Policy plus the amount of the fund shares, such payment to be made not later than 60 days after such death.

2.3 *Death After Termination*—In the event of the death of the Doctor after termination of his Services, the Trustee shall make payments to the Beneficiary based upon, and equal to, amounts, if any, obtainable under the selected method of payment to the Doctor during his lifetime.

The same sections of the amended trust agreement are similar.

[5] The language of sec. 2.5 of the original trust agreement is as follows:

2.5 *Optional Transfers*—In the event of the termination of the Doctor's Services for any reason, including but not limited to termination because of his death or Disability, then anything herein to the contrary notwithstanding, the Trustee may discharge in full its obligations hereunder through its choice of one of the following options, the selection to be at its discretion:

(a) Transfer by absolute assignment of the Policy and proceeds of the fund shares to be paid over a 10 year period to the Doctor or, in the event of his death, to the Beneficiary; or

(b) Transfer by absolute assignment of the Policy and the fund shares to another person or corporation by whom the Doctor may be employed or with whom he may have entered into a contract for services.

trust in either of two ways: "Transfer by absolute assignment of the Policy and proceeds of the fund shares" to be paid over a 10-year period to the doctor or, in the event of his death, to the beneficiary; or "Transfer by absolute assignment of the Policy and the fund shares" to another person or corporation with whom the doctor may have entered into a contract of employment. The choice of the method of discharging its responsibilities under this section was left to the trustee, but either method—transfer by absolute assignment to the doctor or in case of his death to his beneficiary, or transfer by absolute assignment to another employer—would eliminate any possibility of forfeiture for failure to render postretirement services to the hospital.[6]

Third, a trust agreement provision entitled "Retirement"[7] authorized the trustee, in the event of the termination of the doctor's services, to pay the benefits in one of two ways: (1) Consecutive monthly payments, or (2) a single payment equal to the sum of the amounts obtainable by the trustee through the surrender of the policy and the amount of the fund shares. The payment was to be made "not later than 60 days after such termination." Similar provisions appear in both the original and

---

[6] The Apr. 2, 1970, amended agreement adds a sentence to this section, stating: "Such successor person or corporation shall accept such transfer and administer such assets subject to all of the provisions of this Agreement." Does this mean that the doctor could be called upon to perform consulting services for the hospital even though he had entered into a contract for services with another employer? Or does "accept such transfer and administer such assets" refer only to holding, investing, and distributing the corpus of the trust? There is no evidence of record to clarify this ambiguity, but we think the most reasonable interpretation is that the provision relates only to the administration of the trust assets. In other words, the doctor's acceptance of other employment and the transfer of the trust fund to the new employer would terminate any obligation the doctor may have had to render postretirement services.

[7] Sec. 2.1 of the trust agreement was as follows:

2.1 *Retirement*—In the event of any termination of the Doctor's Services, other than a termination occasioned by his death, the Trustee shall pay one of the following benefits to the Doctor during his lifetime, the selection to be at the discretion of the Trustee.

(a) Consecutive monthly payments commencing not later than 60 days after receipt by the Trustee of written notice from the Hospital for such termination based upon, and equal to, the sum of the amounts obtainable by the Trustee;

(1) Through one or more optional modes of monthly settlement (to be selected by the Trustee) on the proceeds from the maturity or surrender of the Policy; and

(2) Through one or more optional modes of monthly settlement (to be selected by the Trustee) on that portion of the funds invested in fund shares; and

(3) Through investment of the balance of the fund shares (after application of paragraph (2)) in a single premium life annuity, 120 months certain, on the life of the Doctor. The selection of the insurance company to issue such annuity shall be at the discretion of the Trustee.

(b) A single payment equal to the sum of the amounts obtainable by the Trustee through the maturity or surrender of the Policy plus the amount of the Fund shares, such payment to be made not later than 60 days after such termination.

amended trust agreements. Since the trustee was authorized by this provision to make a single payment of the entire trust corpus to the doctor at his retirement, it is wholly inconsistent with any theory that the hospital retained the right to compel a forfeiture of the trust fund in order to assure the doctor's postretirement services.

True, the decision as to which method of settlement would be selected was technically left to the discretion of the trustee. But the trustee had no interests adverse to the doctor's, and these funds, in substance, were deposited by the doctor. There is no evidence indicating that the trustee intended to, or would, exercise its discretion in a manner inconsistent with the doctor's interests. Compare *Estate of Harold S. Brooks*, 50 T.C. 585, 592-593 (1968) (an estate tax case).

Finally, there is no provision in the May 1, 1969, version of the trust agreement even suggesting that the entrusted funds were subject to forfeiture in any circumstances. True, one section of the May 1, 1969, trust agreement, quoted above, provided that "after termination of his Services and while his health permits," the doctor would render "such advice and counsel as the Hospital may reasonably and from time to time require." But the succeeding paragraph provided that "For such advice and counsel as the Doctor may render" he would be compensated "at the same rate as his cash compensation rate immediately before termination of his Services." Dr. Richardson did not even sign the trust agreement and nothing in the employment agreements he signed placed any obligation on him to render such services. As we read these provisions, however, the fairest interpretation is that, if he did not render requested advice and counsel, he would not be paid for such postretirement services. Cf. *Estate of James Max Harrison*, 62 T.C. 524, 530-532 (1974). In no sense can it be realistically said that this paragraph created a contingency which might cause the doctor to lose his rights under the trust. Sec. 1.402(b)-1(a)(2)(i), Income Tax Regs.

The April 2, 1970, amendment, as noted above, provides that "If, for any reason, without good cause," the doctor shall after the termination of his services and "while his health permits, fail and refuse to render such advice and counsel, he shall, after due notice of said breach, forfeit all rights under this Agreement." However, we do not think the formality of the adoption of this heavily qualified provision is, without more, sufficient to show that Dr.

Richardson's trust rights were subject to "a substantial risk of forfeiture" within the meaning of section 83(a) and (c)(1). The legislative history of section 83 shows that a practical rather than a formalistic test was intended. S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 501-502. Accordingly, this provision must be interpreted in the light of the facts, discussed above, that the moneys placed in the trust were moneys Dr. Richardson had already earned and which otherwise would have been paid to him as compensation, that any strings on the trust could be severed at Dr. Richardson's retirement by the trustee's paying the full trust corpus to him, and that the hospital's connection with the trust could be severed by Dr. Richardson's accepting other employment and having the fund assigned to his new employer or a new trust. Moreover, neither the trust agreement nor the amendments thereto state what is to be done with the trust corpus in case of a forfeiture by Dr. Richardson.[8]

Significantly, also, section 83(c)(1) refers to "future performance of substantial services," and we think the section means services which the employee would be expected to perform. There is no showing that Dr. Richardson had any capability of performing consultation services or that the hospital had any need or expected to have any need for such services. Indeed, it is stipulated that: "St. Joseph's Hospital of Minot, North Dakota, did not receive advice and counsel from retired physicians during the years 1969 and 1970 or at any time previous thereto." Since there is no showing of any real likelihood that the doctor ever

---

[8] Sec. 6.8(c) of the trust agreement as amended Apr. 2, 1970, does contain the following provision:

(c) In the event of amendment or revocation terminating this Trust Agreement, all assets then held by the Trustee shall revert to the Hospital which shall hold, administer and disburse such assets in exact accordance with the terms of this Agreement. Provided, however, that no such revocation or amendment shall be made for any reason other than a breach by the Doctor of Section 3.

The amended trust agreement gives no clue as to what is meant by the provision that the hospital "shall hold, administer and disburse such assets in exact accordance with the terms of this Agreement." We think the most reasonable interpretation is that the funds are to be held for distribution to the doctor's designated beneficiaries of the life insurance contract and the mutual fund shares in accordance with other provisions of the agreement. On Jan. 25, 1975, sec. 6.8 was further amended, and the amendment recited that it "shall be deemed effective as of May 1, 1969." But sec. 83(a), I.R.C. 1954, requires payments of the character here involved to be included—

"in the gross income of the person who performed such services in the *first* taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, * * * [Emphasis added.]"

The tax character of such payments cannot be changed retroactively.

will be called upon to perform services, we do not think petitioner has shown that his rights under the trust are actually "conditioned upon the future performance of substantial services" within the meaning of section 83(c)(1).

Petitioner's pleas of estoppel are of no avail to his position. He argues that a private letter ruling issued by respondent on July 17, 1970, to a Dr. Heidorn, determined that a similar compensation arrangement effectively deferred taxation, and that this ruling estops respondent from contending that Dr. Richardson is currently taxable on the 1969 and 1970 deposits.

We disagree. The trial record does not contain a copy of the Heidorn trust agreement, and we have no way of knowing whether it contained provisions identical to the ones discussed above. Moreover, the prior ruling was not issued to petitioner, and petitioner had no cause to rely on it. Reliance is a necessary element of estoppel, *Bornstein v. United States*, 170 Ct. Cl. 576, 583, 345 F.2d 558, 563 (1965), and respondent in the instant case therefore cannot be bound by the Heidorn letter ruling. Cf. *Bookwalter v. Brecklein*, 357 F.2d 78, 82-85 (8th Cir. 1966); *Minchin v. Commissioner*, 335 F.2d 30, 32-33 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; *Gerstell v. Commissioner*, 319 F.2d 131 (3d Cir. 1963), affg. per curiam a Memorandum Opinion of this Court, cert. denied 375 U.S. 941 (1963); *Weller v. Commissioner*, 270 F.2d 294, 298-299 (3d Cir. 1959), affg. 31 T.C. 26 (1958) and 31 T.C. 33 (1958), cert. denied 364 U.S. 908 (1960); *Goodstein v. Commissioner*, 267 F.2d 127, 132 (1st Cir. 1959), affg. 30 T.C. 1178 (1958); *Shakespeare Co. v. United States*, 182 Ct. Cl. 119, 128, 389 F.2d 772, 777 (1968); *Knetsch v. United States*, 172 Ct. Cl. 378, 391, 348 F.2d 932, 940 (1965), cert. denied 383 U.S. 957 (1966); *Bornstein v. United States*, 170 Ct. Cl. at 584-586, 345 F.2d at 562-564. Moreover, the record shows that after issuance of that private letter ruling, one of Dr. Richardson's representatives requested additional information from respondent concerning the income tax consequences of the trust, thus indicating that petitioner did not rely on the Heidorn ruling as determinative of his own tax liability.

Petitioner argues, finally, that he relied on a letter his attorney received from respondent dated May 11, 1971, after the close of the tax years in issue, as representing respondent's determination that the compensation plan would be effective in deferring

taxation. However, that letter does not purport to be a ruling. The letter clearly states that respondent will not issue definitive determinations as to the efficacy of forfeiture provisions until the adoption of regulations under section 83. Those regulations were first published, in proposed form, on June 3, 1971. As yet, they still have not been promulgated in final form.

Accordingly,

*Decision will be entered for the respondent.*