MARTIN R. JAROS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jaros v. Commissioner
Docket Nos. 10385-79, 16237-81, 16256-81, 31035-81, 12145-82, 22721-82, 24397-82.
United States Tax Court
T.C. Memo 1985-31; 1985 Tax Ct. Memo LEXIS 603; 49 T.C.M. (CCH) 548; T.C.M. (RIA) 85031; January 15, 1985. *603 Ps claimed losses and an investment tax credit as members of a partnership which acquired and distributed a motion picture film. Held: (1) None of the claimed losses is deductible because the partnership's activities were not engaged in for profit within the meaning of sec. 183, I.R.C. 1954. (2) Because the partnership did not acquire and distribute the film with the intention of making a profit, Ps are not entitled to an investment tax credit under sec. 38, I.R.C. 1954. Thomas J. Ellsworth, for the petitioners. Marc J. Winter, for the respondent. SIMPSON MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows: Docket No.
Petitioner
Taxable Year
Deficiency
10385-79
Martin R. Jaros
1972
$328.00
1973
977.00
1974
2,957.00
1975
8,957.00
16237-81
Ernest G. DeGraw
1972
2,662.00
and Nadine DeGraw
1975
8,166.00
1976
12,439.00
16256-81
L. Milton Anderson
1972
1,225.39
and Elizabeth
1973
1,405.24
L. Anderson
1974
1,257.00
1975
3,411.00
1976
1,478.00
31035-81
Edwin M. Herzog
1975
6,620.00
and Rochelle A.
Herzog
12145-82
William D. McCullough
1975
16,494.00
and Linda McCullough
22721-82
Ludwig Pazdernik and
1975
12,265.00
Liselotte Pazdernik
1976
1,415.00
24397-82
Donald H. Dies and
1972
2,090.00
Marian A. Dies
1973
1,535.24
1974
796.87
1976
850.70
1977
1,422.00
*604 The issues for decision are: (1) Whether the petitioners, as limited partners of a partnership engaged in the distribution of a motion picture, are entitled to deductions for distributive shares of losses reported by the partnership and, if so, in what amounts; and (2) whether the petitioners are entitled to investment tax credits. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. When they filed their petitions in this case--the petitioner Martin R. Jaros maintained his legal residence in Minnesota; the petitioners Ernest G. and Nadine DeGraw, husband and wife, maintained their legal residence in Colorado; the petitioners Donald H. and Marian A. Dies, husband and wife, maintained their legal residence in Arizona; and the petitioners L. Milton and Elizabeth L. Anderson, husband and wife, Edwin M. and Rochelle A. Herzog, husband and wife, William D. and Linda McCullough, husband and wife, and Ludwig and Liselotte Pazdernik, husband and wife, all maintained their legal residences in California. Mr. Jaros and Mr. and Mrs. DeGraw filed Federal income tax returns for the years at issue with the Internal Revenue Service Center, Ogden, Utah. Mr. and *605 Mrs. Dies filed Federal income tax returns for the years at issue with the Internal Revenue Service Center, Philadelphia, Pa. The other petitioners all filed Federal income tax returns for the years at issue with the Internal Revenue Service Center, Fresno, Calif.
The motion picture entitled "Dick Deadeye" is a full length, animated musical with an original screenplay by Leo Rost and Robin Miller adapted from various operettas of Gilbert and Sullivan, including "H.M.S. Pinafore," "The Pirates of Penzance," "The Sorcerer," "Trial by Jury," "Ruddigore," and "The Mikado." Musical arranger Jimmy Horowitz updated the original Gilbert and Sullivan music by introducing a "rock beat" and some new lyrics by Robin Miller. The animation was based on original drawings prepared by Ronald Searle. The film's principal character is Dick Deadeye, a British sailor, who is hired to find the stolen "ultimate secret." After several "rock" songs, Dick Deadeye finally finds the "ultimate secret," which is revealed to be "love." The film was produced by Mr. Rost and Steven Melendez and directed by Bill Melendez, Steven's father. The physical production and animation of the film was carried out in London, *606 England, by Bill Melendez Productions Ltd. and was completed sometime in early July 1975. Bill Melendez Productions also produced the popular "Charlie Brown" television specials, based on the "Peanuts" cartoon strip. However, "Dick Deadeye" was the production company's first full-length feature film. Production of the film was financed initially with funds provided by Bill Melendez, Mr. Rost, and several outside investors. The financing was arranged through Film Story Finance Ltd. (FSF), a Bahamian corporation, of which Mr. Rost was president and Bill Melendez was vice president and secretary. FSF was organized solely to finance and own the film and all ancillary rights, including books and records. The original budget for the film was about $800,000, but it eventually rose to almost $1 million due to cost increases caused by inflation and production delays. FSF was forced to seek additional outside financing in order to complete the film.The added funds were provided by Calendula, Ltd. (Calendula), [2] a tax shelter group represented by attorney Robert A. Kantor of San Francisco, Calif. The transaction with Calendula appears to have been a "negative pick-up" tax shelter wherein *607 Calendula purchased all rights to the film for $1 million (its negative cost [3] *608 ), paying FSF $250,000 cash (less some amount for legal fees) and giving FSF a note for $750,000. FSF retained all copyrights associated with the film and also retained or received the exclusive, worldwide right to distribute the film in perpetuity. In early 1975, FSF engaged Cinema International Corporation (CIC), a large company owned jointly by Paramount Pictures and Universal Pictures, to distribute the movie in the United Kingdom. CIC spent about $20,000 of its own money on advertising and prints in preparation for the film's release. The film opened in London, England, in July 1975.The opening was not successful, and CIC returned its distribution rights to FSF. Mr. Rost subsequently loaned FSF $10,000 to reopen the film in Glasgow and Edinburgh, Scotland, on December 29, 1975, but that opening was also unsuccessful. Immediately after the disappointing opening in London, Mr. Rost traveled to Los Angeles and New York seeking a new distributor for "Dick Deadeye." Occasionally joined by Bill Melendez, Mr. Rost screened the film for every major distributor in the United States, as well as many minor distributors. Despite their combined efforts, Mr. Rost and Bill Melendez were unsuccessful in securing a distributor. Mr. Rost described the distributors' reaction: Interesting film, they would say. They would look at it. Sometimes they would want to see it twice and invite a couple of their *609 other executives to come. They didn't walk out of the room. They said they didn't know quite how to market it. You know, what was the market? Was it a children's film? Was it an adult film? * * * In about September 1975, Mr. Rost traveled to Milan, Italy, to attend the Milan International Film Exhibition (MIFED). MIFED is an annual, 2-week "film bazaar" where film makers, buyers, and distributors from many countries meet to view films and, hopefully, make deals. It is not open to the general public. According to a letter which he wrote to Mr. Kantor in October 1975, Mr. Rost worked hard to secure distributors around the world for "Dick Deadeye." Nevertheless, the response was, in his words, "underwhelming," and consequently, he was "not too optimistic." However, Mr. Rost "did run into several USA distributors who screened the film and offered to back up any Shelter deal we [FSF and Calendula] did by promising an adequate USA distribution/advertising etc. (for which we'd have to pay somewhere between $40,000 and $50,000 but [which] would 'guarantee' * * * an Amortization deal tax-respectability.[)]" Among such American distributors was Sandy Cobe. Mr. Cobe had formed International *610 Releasing Corporation 10 (IRC) with David Baughn sometime in early 1975. Mr. Cobe was the president of IRC and responsible for the purchase of films and their foreign distribution. Mr. Baughn was vice president in charge of domestic distribution. Prior to forming IRC, Mr. Code had little or no experience in theatrical distribution in the United States, while Mr. Baughn's domestic theatrical distribution experience was largely limited to the western United States. Neither Mr. Cobe nor Mr. Baughn had any experience in 1975 in the distribution of films to television. IRC was a small, independent distributor of motion pictures. Generally, a motion picture producer approached an independent distributor like IRC only after having been turned away by the "major" distributors, such as Columbia Pictures, MGM, Paramount Pictures, and Warner Brothers, and by the "mini-major" distributors, such as Avco Embassy, A.F.D., and Filmways.During 1975, IRC was distributing approximately 35 films, of which about two-thirds were owned by limited partnerships. Mr. Cobe was actively involved with Thomas J. Ellsworth, a Los Angeles attorney and accountant, in the tax shelter syndication of movies and *611 master recordings in 1975 and 1976.Mr. Cobe and Mr. Ellsworth became acquainted in the early 1970s.Sometime in the late spring or early summer of 1975, Mr. Ellsworth approached T. Fitzgerald Smith, another attorney, and asked Mr. Smith if he would like to participate in entertainment investments. Mr. Smith had no previous experience in the entertainment industry. Mr. Ellsworth and Mr. Smith became law partners in September 1975. Eventually, Mr. Smith became the general partner of seven or eight movie and master recording limited partnerships formed in 1975 and 1976. The legal documents for each partnership were prepared by Mr. Ellsworth, and the entertainment product acquired by each partnership was distributed by one of Mr. Cobe's several distribution companies. Most of the limited partnerships did not return a profit to their investors; the record is silent as to the profitability of the others. Mr. Cobe, Mr. Ellsworth, and Mr. Smith understood that IRC would distribute any suitable motion picture discovered by Mr. Cobe at MIFED. Mr. Rost showed "Dick Deadeye" to Mr. Cobe at MIFED. Although Mr. Cobe knew of the film's "disastrous" box office revenue in its earlier London *612 release, he agreed to distribute the film. Mr. Rost originally thought Mr. Cobe would sub-distribute the film on behalf of FSF. However, when he traveled to Los Angeles to meet Mr. Cobe again, Mr. Rost learned the details of Mr. Cobe's intended arrangements. Mr. Cobe would form a limited partnership to purchase the film and provide money for its distribution. Mr. Cobe would then enter into a distribution agreement with the partnership. Mr. Rost was made to understand that these arrangements were necessary in order to provide tax benefits to the investors in the partnership. When Mr. Cobe returned to Los Angeles from MIFED, he showed clips of the movie to Mr. Smith. He told Mr. Smith that the film's potential gross revenues from theaters and subscription television could reach $10 million. Mr. Smith knew the film had previously been released in England, but he did not inquire as to the financial results of that release. Mr. Smith agreed to become the general partner of a limited partnership to be formed to acquire the movie. He also agreed that IRC would be the distributor. Mr. Smith made no attempt to seek another distributor because he knew no other distributor, and Mr. Cobe *613 "was at hand," had "all of the trappings of being reasonably successful in this business," and "seemed to get on" with Mr. Ellsworth. Mr. Smith made no independent investigation of Mr. Cobe's reputation in the industry as a distrubor, nor did he ask to see any records regarding other movies distributed by Mr. Cobe to determine whether they had been profitable. Mr. Kantor, as representative of Calendula, the film's owner, agreed to sell the film if a price could be negotiated. Because FSF held the worldwide distribution rights to the film, Mr. Rost also had to agree to the sale. However, Mr. Rost "wanted a deal to happen," because there was no doubt in his mind that Mr. Cobe's offer presented the sole opportunity for getting the film distributed in the United States.Mr. Rost only sought to insure that FSF received $20,000 cash at the outset to pay some debts remaining from the film's production and $50,000 every 18 months. The purchase price for the film was negotiated primarily by Mr. Kantor, Mr. Cobe, and Mr. Ellsworth. Mr. Smith may have been present, but he did not actively participate in the negotiations. Moreover, Mr. Smith did not secure an independent appraisal of the film's *614 value either before or after the film's purchase; he relied upon Mr. Cobe's estimate of the film's potential. The purchase price finally agreed upon was not reached at arm's length. The negotiations were "hard fought" only as to the amount of the purchase price which the partnership would have to pay up front, in cash. At about the same time as the negotiations over the purchase and distribution of the film were going forward, Mr. Ellsworth prepared the necessary legal documents. The limited partnership agreement, dated December 2, 1975, was executed by Mr. Smith as general partner, and the certificate of limited partnership was filed in Los Angeles on December 31, 1975. The partnership's office was located in the law offices of Smith & Ellsworth. Mr. Ellsworth also prepared a private placement memorandum which would be distributed to prospective limited partners. Dated December 2, 1975, the memorandum specified that 700 limited partnership "units" would be sold for $500 per unit. The general partner, Mr. Smith, was not required to make any capital contribution. Ninety-five percent of the partnership's profits and losses were to be allocated to the limited partners based on *615 the percentage of units which each owned. The remaining 5 percent was to be allocated to the general partner. It was estimated that the total revenue of $350,000 derived from the sale of units would be spent as follows: Initial Management Fee
(to Mr. Smith)
$5,000
Downpayment for purchase price of
picture
100,000
Prepayment of royalty expense
100,000
Distribution cost (to IRC)
135,000
Organization costs (to Smith &
Ellsworth)
5,000
Tax counsel (to Smith & Ellsworth)
5,000
Total expenses
$350,000
IRC was to pay finder's fees of $52,500 to salesmen of partnership units out of its distribution fee of $135,000. The memorandum contained only a single sentence describing the movie; it did not identify the film's producer, director, writer, or animator. The film's purchase price was given as $2,980,000, payable with $100,000 cash at closing and a $2,880,000 nonrecourse promissory note due on December 31, 1987. The memorandum contained no projections of the film's expected box office revenues, nor were there any estimates of the amount or timing of profit which was expected to be returned by the film. The paragraph of the memorandum entitled "Economic Consequences" read in its entirety as follows: The *616 Partnership will take deductions in 1975 for Federal Income Tax purposes of $1,281,500 as follows: Investment tax credit (1)
$576,000
Depreciation
400,500
Prepaid Expenses
245,000
Costs
10,000
Total Deduction to
Partnership
$1,281,500
[sic]
Less 5% Interest of
[4]Original Limited Partner 64,075
Total Deduction to Unit
Holders Assuming all
Units are sold.
$1,217,425
= 348%(2)
Assuming an investor is in an average composit[e] tax bracket of 50 percent for federal income tax purposes, the intended result per $25,000 of investment for 1975 is as follows: (4) Cash Capital Contribution
$25,000
Tax Write-Off at 348% = 87,000
Tax Savings at 50% (Federal)
43,500
Excess of Cash Received From
Tax Savings Over Cash
Investment
$18,500
(1) Assuming an investor is in the 50 percent tax bracket for Federal Income Tax purposes, $1.00 of investment credit is equivalent to $2.00 of tax "deduction". (2) Depreciation for the purpose of this computation has been computed on the basis of an 8 year life using the double declining balance method and the ADR half-year convention. Also included is 1st year bonus depreciation based on the assumption that there will be ten investors, all of which *617 will file joint returns with spouses. To the extent the ultimate facts differ from these assumptions, these computations will change. [5] (3) Additional tax savings might result with respect to state income taxes. (4) Does not reflect any income from the distribution of the Picture, which however is anticipated. The economic consequences in subsequent years depends upon how well the Picture does. Each year the Picture will be depreciated. As to the ultimate consequences should the non-recourse note not be paid, see the tax opinion set forth as Exhibit III hereto. A legal opinion concerning the tax consequences of participation in the partnership, prepared by Mr. Ellsworth, accompanied the memorandum. This tax opinion was much longer than the memorandum itself. An earlier draft of the memorandum, also dated December 2, 1975, differed from the final version on the most crucial details. In the earlier version, only 70 units at $5,000 per unit were to be sold. The purchase price of the movie was lower, that is, $1,600,000, payable with $95,000 cash and a $1,505,000 *618 nonrecourse promissory note. Because of the lower purchase price, the announced tax "write off" was only about 2 to 1, rather than the nearly 3.5 to 1 promised under the final version of the memorandum. Sales of limited partnership units began in December 1975. Mr. Cobe supervised the sale of units and paid commissions to salesmen out of the distribution funds which IRC eventually received from the partnership. Mr. Ellsworth was among those persons who received a finder's fee for selling units. Mr. Smith declared that he did not sell any units and that in 1975 he did not know who was selling units or that Mr. Ellsworth was receiving a commission for selling units. Sales of units in 1975 generated only $137,000 of the anticipated capital investment of $350,000. Sales continued in 1976, but by the end of that year, a total of only $183,000 cash had been contributed to the partnership. By agreement dated December 2, 1975, the partnership acquired all of Calendula's rights in the film in the United States and Canada. Under the express terms of the acquisition agreement, Calendula was to be paid $66,666.66 in cash at closing and be given a nonrecourse, non-interest-bearing note for *619 $2,913,334.00 (the deferred indebtedness), with $33,334.00 due by December 31, 1976, and the balance of $2,880,000.00 due by December 31, 1987. The cash payment due at the time of closing was less than the $100,000 originally contemplated in the private placement memorandum because of the difficulty the partnership promoters were having selling units. Prior to December 31, 1987, the partnership was obligated to pay annual installments of 30 percent of the year's distribution revenues. In January 1976, the partnership executed a promissory note, secured by the film rights acquired, for the amount of the deferred indebtedness. The partnership also entered into a royalty agreement and a distribution agreement in December 1975. Under the royalty agreement, the partnership agreed to make payments to International Authors, S.A. (International Authors), an organization the nature and purpose of which is not clear from the record. The royalty agreement stated that International Authors was the "owner of certain underlying literary rights in the Film." Mr. Kantor signed the agreement on behalf of International Authors. The agreement obligated the partnership to pay International Authors *620 20 percent of all "distribution revenues" in perpetuity, as well as the sum of $100,000 on or before December 31, 1976. Distribution revenues were defined as "the amounts credited to, received and/or collected" by the partnership from any distributor of the film. Under the distribution agreement and an amendment thereto, the partnership granted IRC the exclusive right to distribute "Dick Deadeye" throughout the distribution territories acquired by the partnership. Although the agreement purported to be effective for 10 years, the partnership's rights thereunder would terminate, and such rights would immediately inure to the benefit of International Authors, in the event that the partnership failed to pay Calendula the $100,000 due it on or before December 31, 1976. Moreover, IRC's distribution rights would continue only so long as IRC paid FSF at least $50,000 every 18 months. Amounts received by Calendula under the acquisition agreement and by International Authors under the royalty agreement were to be credited against the $50,000. The distribution agreement entitled IRC to a distribution fee of 50 percent of the adjusted gross receipts derived from theatrical exhibition, 40 *621 percent of the adjusted gross receipts derived from network television sales, and 60 percent of the adjusted gross receipts derived from syndicated television sales. "Adjusted gross receipts" were defined as "gross receipts" (the actual amounts paid by exhibitors, television, and nontheatrical outlets) less "authorized deductions" (all direct, out-of-pocket distribution expenses, including shipping, prints, and advertising). Thus, IRC would recover all of its distribution expenses off the top before it was required to pay the partnership a share of the gross receipts. By separate agreement, IRC was also entitled to $100,000 in predistribution funds on or before December 31, 1976. The 50 percent fee payable to IRC for theatrical distribution was somewhat higher than the norm in the distribution industry, particularly in light of the fact that the partnership was obligated to pay IRC $100,000 for its distribution expenses. IRC agreed to release the film prior to December 31, 1975, and to use its "best efforts" to distribute the film so as to maximize receipts. However, IRC was granted "sole control and discretion" with respect to all matters involving the film's distribution. *622 IRC was forbidden from distributing the film to network television prior to September 1, 1977, and any network sale thereafter would require the approval of Calendula. Under the acquisition agreement, the partnership paid Calendula $68,222 in 1975 and nothing in 1976 and 1977. Under the royalty agreement, the partnership made no payments to International Authors in 1975, 1976, and 1977. Under the distribution agreement, the partnership paid IRC nothing in 1975, $59,778.00 in 1976, and $30,077.27 in 1977. Although the partnership has defaulted on its obligation to pay International Authors $100,000 by December 31, 1976, International Authnors has never threatened legal action. However, as will be discussed later, the partnership and IRC reached an accommodation in 1976 with Calendula and Mr. Rost (as successor to all of FSF's interests) upon the partnership's failure to pay the balance of the $33,334 payment due by December 31, 1976, and IRC's failure to pay FSF (now Mr. Rost) $50,000 every 18 months. The film was first releazsed by IRC during the week of December 17 through December 23, 1975, at the Mann Bruin Theater (Mann Bruin) in Westwood, Calif. The Mann Bruin was a well *623 known theater, but the week before Christmas is one of the lowest grossing weeks of the year for movie theaters because most people are busy shopping.The pre-Christmas week is a particularly poor one in which to premier a film because a film's opening box office revenues are typically published in Variety magazine, a trade publication; a poor opening box office significantly reduces the interest of prospective exhibitors. "Dick Deadeye" had a gross box office of about $3,500 for the entire week. The Mann Bruin's average weekly box office in 1975 was about $40,000 per week. After this poor opening, few theaters would be interested in exhibiting the film, and as Mr. Cobe admitted, network television "wouldn't touch it." To qualify for Academy Award consideration, a picture must play for one week, anytime during the year, in any theater in the Los Angeles area; it does not have to be exhibited the week before Christmas. There was no Academy Award category devoted to full-length animated films in 1975. IRC's distribution of the film generated the following theatrical rentals: Date
Theater
Location
[6]Gross Rentals 12/17 to
12/23/75
Mann Bruin
Westwood, Calif.
$1,100.00 5/22/76
Moore Egyptian
Seattle, Wash.
74.25 5/30/76
Moore Egyptian
Seattle, Wash.
29.25 9/23 to
9/29/77
Fox
Springfield, Mo.
(452.73)
11/2 to
11/8/77
Cineworld
Eugene, Ore.
(89.23)
11/2 to
11/8/77
Springfield No. 4
Springfield, Ore.
(121.47)
6/12 to
6/13/78
Center
Jacksonville, Fla.
50.00 6/20 to
6/21/78
Plaza No. 1
West Palm Beach, Fla.
50.00 7/7 to
7/11/78
Taku No. 2
Juneau, Alaska
75.00 7/14 to
7/20/78
Totum No. 1
Anchorage, Alaska
100.00 11/3 to
11/4/78
Bacon
Alma, Ga.
45.00 11/10 to
11/16/78
Firewood
Anchorage, Alaska
75.00 12/7/78
Nuart
Los Angeles, Calif.
136.50 12/23 to
12/24/78
Cove
Hermosa Beach, Calif.
75.00 12/29/78
Sombrero
Phoenix, Ariz.
75.00 2/7 to
2/8/79
River Oaks
Houston, Texas
176.75 2/14 to
2/15/79
Olmas
San Antonio, Texas
29.75 2/21 to
2/22/79
Granada
Dallas, Texas
71.31 2/28 to
3/1/79
Don Ponchos
Alburquerque, N.M.
43.34 3/14 to
3/15/79
Pryana
New Orleans, La.
65.10 3/14 to
3/20/79
Dededo
Agana, Guam
150.00 5/12/79
TLH Cinema
Philadelphia, Pa.
100.00 6/3/79
Univ. Calif.
Berkeley, Calif.
229.00 Berkeley
Total gross
$2,086.82 *624 Mr. Baughn, who handled IRC's distribution of "Dick Deadeye," initially planned to attract a sophisticated audience familiar with Gilbert and Sullivan music by playing the film in large metropolitan areas, starting exclusively in Los Angeles, New York, Chicago, and other major cities. Only after the film developed a following would it be distributed to smaller cities. However, after the "devastatingly negative" effect of the Mann Bruin run, Mr. Baughn started looking for other audiences. The film was not exhibited again until May 1976. In that month, it played two midnight shows at the Moore Egyptian theater in Seattle, an art "cult" film theater. However, the film was not an "art" film, nor did it generate a "cult" *625 following. After three money losing playdates in 1977, the film was exhibited at two "kiddie matinees" in Florida.When parents found some of the scenes unsuitable for children, several additional matinees had to be cancelled. All playdates after 1977 were "allowed," i.e., IRC would allow the film to be shown on a particular date if asked. IRC did not itself seek out exhibitors. An "allowed" showing generates a small amount of revenue, usually a flat fee, and does not require the distributor to spend any money on co-op advertising. When a film is distributed at a flat rate in a particular area, it is an indication that the distributor thinks the film has no future, and after playing at flat rates, it would be difficult, if not impossible, for the distributor to get a percentage rate contract with an exhibitor. The playdates after the Mann Bruin opening do not reflect any plan or recognizable method of distribution. Mr. Cobe acknowledged that the film could not make money with this type of bookings for the film. Sometime in 1979, Mr. Cobe told Mr. Baughn to stop theatrical distribution of the film. Under the distribution contract, IRC did not have the right to distribute the film *626 to television prior to September 1, 1977. In 1975, the television market consisted of sales of single films to network television and sales of a package of 15 to 30 films to individual television stations, referred to as "syndication." There was no "pay" television market.In late 1976, the partnership and IRC were forced to relinquish all rights to network television distribution to Calendula (or International Authors) and Mr. Rost, as successor in interest to FSF, when the partnership failed to pay Calendula the balance of the $33,334 due by December 31, 1976, and when IRC failed to pay FSF the $50,000 due it every 18 months. Subsequently, in about 1981, a dispute arose between Mr. Rost and IRC as to whether, in 1976, the partnership and IRC had given up all pay and cable television rights and video cassette and disc rights. This dispute was resolved by permitting IRC to retain the first $35,000 received from such sources. Any amount in excess of $35,000 was to be paid to Mr. Rost, with the exception that IRC could retain 50 percent of amounts received from sales of video cassettes and discs. Furthermore, Mr. Rost replaced IRC as distributor of the film to television. However, *627 IRC retained the right to distribute the film on video cassettes and discs. As of December 29, 1981, IRC had received the following amounts from the film's distribution to pay television: System
Playdate
Amount Received
Prism
Feb. 1981
$ 3,750.00
Warner Qube
March 1981
16.88
Cinemax
March 1981
7,500.00
Wometco Home
Theater
June 1981
3,750.00
Total
$15,016.88
The film has never been sold to network television and has never been part of a syndication package. As of July 20, 1976, IRC had incurred distribution expenses as follows: Negative costs (including cost of
redubbing in stereo sound)
$ 5,852.50
Expenses of Mann Bruin opening
22,605.94
Commissions regarding sale
to limited partners
27,600.00
Freight
1,209.46
Screenings, MPAA rating, other
miscellaneous expenses
3,010.00
Total expenses
$60,277.90
The amount expended for commissions for sales of limited partnership units is not considered to be a "distribution expense" in the industry. Most of the expenses incurred by IRC were in connection with the Mann Bruin opening; after the opening, IRC expended very little distributing the film. Mr. Smith made no attempt to increase or improve the film's distribution before 1979. He described his duties as general partner *628 as follows: "To receive reports from Mr. Cobe, to report to the limited partnerships [sic] and to ride herd on the progress of the film." He defined "riding herd" on the film's progress as: "Sandy Cobe would call me up and tell me if things were happening and what was going to be done. I don't specifically recall. I would say 'fine,' 'Good,' and that is all." Mr. Cobe did not seek Mr. Smith's permission before taking any action with respect to the film. Mr. Smith neither exercised, nor believed he had the power to exercise, any control over the way Mr. Cobe disbursed the distribution funds that he received from the partnership. So long as Mr. Cobe used his "best efforts," Mr. Smith believed Mr. Cobe had unlimited discretion as to the film's distribution. On several occasions, Mr. Rost sought to move Mr. Cobe to promote and distribute the film more vigorously. However, his efforts did not meet with success. Mr. Cobe blamed the lack of distribution on a shortage of distribution funds caused by the undersubscription of the limited partnership offering. He refused to put any of his own money into the film's distribution. By early 1977, Mr. Rost appears to have had enough of Mr. *629 Cobe's excuses; writing to Bill Melendez and Mr. Kantor, he stated: My feeling is that we'd be better off out of Sandy's distributional hands. I do not believe he ever intended to do a job for this film, that from the beginning it was a tax situation alone that interested him. My evidence for this feeling is: (1) he has never spent a penny of his own money. [T]o this date [he] does not have an advertising or promo program arranged or laid out in any way. (2) he has shown no interest in getting available merchandising material such as books or records etc. Now, without the TV rights, and his having to spend $10,000 [on direct advertising, under the 1976 agreement which permitted the partnership and IRC to retain theatrical but not television distribution rights] I do not believe he will move forward. We look to Bob Kantor for legal advice on whether or not we can just move in and take over the film. * * * The partnership has never made a profit on its investment in the film. The partnership's Federal tax returns were filed on a calendar year basis and were prepared by use of the cash method of accounting. The following is a summary of the income and expenses reported on the partnership's *630 returns for 1975, 1976, and 1977: 1975
1976
1977
Gross receipts
$ 258 Expenses: Depreciation
of film
$62,083 729,479 $547,110 Amortization of
organizational
costs
83 1,000 1,000 Distribution costs
59,778 38,077 Management fee
5,000 Legal fee
5,000 1,843 Accounting fee
30 Bank charge
8 Total expenses
$72,166 $790,257 $588,068 Net Loss
($72,166)
($789,999)
($588,068)
The partnership claimed a depreciable cost basis in the film of $2,980,000. The depreciation claimed for each of the 3 years was calculated by use of the double declining balance method over an 8-year life. The claimed deductions for organizational costs resulted from the amortization of a legal fee of $5,000, paid to the law firm of Smith & Ellsworth in 1975, under the straight line method over a 5-year period. The management fee of $5,000 deducted in 1975 was paid to the general partner, Mr. Smith. The legal fee of $5,000 deducted in 1975 was paid to the law firm of Smith & Ellsworth. The partnership also claimed in 1975 that it owned property qualified for an investment tax credit of $2,980,000. The petitioners utilized their distributive share of such credit on their individual tax returns for 1975, and certain of the petitioners *631 carried unused portions of the credit back to prior tax years and forward to subsequent tax years. Except for Mr. McCullough, each of the petitioners was a limited partner in the partnership during 1975 and 1976. Prior to December 1975, none of these limited partners had any experience or background in the production, distribution, or marketing of motion pictures. From December 1975 until the time of trial, none of these limited partners has personally attempted to distribute or promote the movie, "Dick Deadeye," acquired by the partnership. The following table details each limited partner's cash contribution to and percentage interest in the partnership, as well as the amount of each partner's distributive share of the partnership losses and investment tax credit claimed on his personal income tax return in the given years: Percentage
Investment
Partner
Year
Contribution
Interest
Loss
Tax Credit
Martin R. Jaros
1972
$328.00
1973
977.00
1974
2,957.00
1975
$10,000.00
6.64
$4,792
7,532.00
Ernest and
1972
2,662.00
Nadine DeGraw
1975
5,000.00
3.32
2,396
7,232.00
1976
5,000.00
5.20
41,080
L. Milton and
1972
1,225.39
Elizabeth
1973
1,405.24
Anderson
1974
1,257.00
1975
4,000
2.66
1,920
7,927.00
1976
2.08
2,080
1,048.00
Edwin and
1975
3,000
1.99
1,436
5,931.00
Rochelle Herzog
Linda McCullough
1975
7,000
4.90
3,536
14,748.00
Ludwig and
1975
6,000
3.99
2,879
10,949.00
Liselotte
1976
3.11
3,121
7.00
Pazdernik
Donald and
1972
2,090.00
Marian Dies
1973
1,535.24
1974
796.87
1975
2,500
1.66
1976
1.30
10,270
959.00
1977
1.30
1,121.00
The *632 Commissioner had disallowed all of the deductions and resulting losses claimed by the partnership in 1975, 1976, and 1977, and has also disallowed the investment tax credit. OPINION The ultimate issues to be decided in this case are the extent to which the petitioners are entitled to deduct their share of the losses of Dick Deadeye, Ltd., for the years at issue and whether the petitioners may claim an investment tax credit with respect to the motion picture purchased by the partnership in 1975. The Commissioner's primary position, and the one we shall address first, is that Dick Deadeye, Ltd., did not engage in its film acquisition and distribution activity with the intention of making a profit. Accordingly, the Commissioner argues, the limited partners are entitled to no investment tax credit and may deduct various claimed expenses only to the extent allowable under section 183 [7] of the Internal Revenue Code of 1954. Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions arising out of such activity shall not be allowed except *633 as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). It is well settled that in order to constitute the carrying on of a trade or business under section 162(a), [8] the activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; see also Hager v. Commissioner,76 T.C. 759, 784 (1981), and the cases cited therein. Whether a partnership is engaged in a trade or business with the intention of making *634 a profit must be established at the partnership level. Fox. v. Commissioner,80 T.C. 972, 1006 (1983), affd. by order (2d Cir., Jan 23, 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984); Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The expectation of profit need not be a reasonable one; it is sufficient if there is a bona fide objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,supra at 1006; Hager v. Commissioner,supra.The issue of whether there is the requisite intention to make a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case ( sec. 1.183-2(b), Income Tax Regs. ; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980)), and the burden of *635 proving the intention is on the petitioners (Rule 142(a), Tax Court Rules of Practice and Procedure; Golanty v. Commissioner,supra at 426). Greater weight is to be given to objective facts rather than to the parties' mere statements of their intent. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,supra at 1007. In determining partnership intent, we have often focused upon the actions taken by the general partner of a limited partnership where the general partner was the one who actually conducted all partnership affairs and whose expertise was relied on in making partnership decisions. See, e.g., *636 Siegel v. Commissioner,supra;Brannen v. Commissioner,supra;Hager v. Commissioner,supra. However, in the present case, as in Fox, much of our attention must be directed to the activities of Mr. Cobe and Mr. Ellsworth, the promoters of the partnership. Although Mr. Smith was the nominal general partner, it is clear that he relied completely upon Mr. Cobe and Mr. Ellsworth to form and manage the partnership, negotiate the film's purchase, and distribute the film. Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of some relevant factors to be considered in determining whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; *637 and (9) whether elements of personal pleasure or recreation are involved. At trial and on brief, the petitioners have maintained that the activities of Dick Deadeye, Ltd., were engaged in for profit. In support of their position, they have relied primarily on the testimony of Ronald Kindschi, a limited partner who also sold limited partnership units to several of the petitioners, and of Mr. Smith, to the effect that their participation in the partnership was motivated by a desire for a profit. However, after an extensive examination of the record, it is clear to us that the activities of Dick Deadeye, Ltd. , were not in fact engaged in for profit. Although many factors have affected our conclusion, we are particularly influenced by the telling juxtaposition of the conduct of the partnership and its agents and of Mr. Rost, the film's producer. Throughout the years involved here, Mr. Rost's actions have always been those of a man with a genuine profit motive. In contrast, the impression created by the collective actions of the partnership's agents is one of unconcern for the film's success or failure. As Mr. Rost belatedly recognized, to his own chagrin, it was the "tax *638 situation" alone which interested the partnership's agents. Before addressing the factors listed in the regulations, we shall first examine the circumstances surrounding the formation of the partnership and its acquisition of the film, which bear on our conclusion that the partnership was not an activity engaged in for profit. First, the private offering memorandum circulated to potential limited partners focused almost exclusively on the anticipated tax benefits of an investment in the partnership. A tax avoidance purpose is not inconsistent with the desire to earn profits ( McLane v. Commissioner,46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967); Knetsch v. United States,172 Ct. Cl. 378, 348 F.2d 932 (1965)), but where an activity is engaged in solely to reduce Federal income taxes, the activity is not considered to be engaged in for profit ( Hager v. Commissioner,76 T.C. at 785; DeWoskin v. Commissioner,35 T.C. 356 (1960)). In the partnership's private offering memorandum, there is no discussion of the amount or even the likelihood of profits which an investor might expect. Beyond a single-sentence description of the film, there is no discussion of its *639 particular merits as an investment vehicle. Likewise, although the memorandum mentions that IRC had been selected to distribute the picture, there is no mention of IRC's past experience or success as a distributor, nor is there mention of any specific distribution plan. In fact, the memorandum contained no projections of distribution revenue at all. The differences between the draft and final version of the memorandum also indicate that the partnership was formed solely to obtain tax benefits for its members, and not profits. In the final version, the price of a limited partnership unit is reduced while the purchase price of the film is increased by over $1.3 million.Both changes were obviously designed to make the offering more attractive; first, by lowering the price of participation, and second, by increasing the anticipated tax "write off" from about 2 to 1 to nearly 3.5 to 1. Second, it is also evident to us that the film was acquired by the partnership at a highly inflated price. Mr. Smith, as general partner, obligated the partnership to pay Calendula $2,980,000 for the film and to pay International Authors--an organization that neither he nor any other witness seemed to *640 know anything about--$100,000 by December 31, 1976, and 20 percent of the partnership's receipts in perpetuity as "royalties." The Commissioner maintains that the film had no value in December 1975. He introduced the testimony of two expert witnesses in support of his position. The Commissioner's first expert, William A. Madden, had formerly been employed by MGM Studios (MGM) as corporate vice president and general sales manager, a position requiring him to evaluate the theatrical potential of films and to direct their distribution. After retiring from MGM, Mr. Madden was employed by several independent distribution companies. He also taught a course at the University of California at Los Angeles on motion picture marketing and distribution. In Mr. Madden's opinion, the film "Dick Deadeye" had no fair market value as of December 1975 in the United States and Canadian theatrical markets. He made the following observations, among others, in his written appraisal of the film: The heavy English accents and the intrusion of "Rock" music make this film most confusing to follow. At the conclusion of the screening, one gets the feeling that all the entertainment elements of "Gilbert *641 and Sullivan" never really surface. Further, the music and dialogue at times do not blend with the action. * * * While the idea of using "Gilbert and Sullivan" operettas as the storyline in making a motion picture is appealing, it is unfortunate that the writers, Leo Rost and Robin Miller[,] fail to put together a very comprehensive or interesting script. * * * Steven and Bill Melendez have made a feature film that will not appeal to children or Gilbert and Sullivan fans. * * * Ronald Searle, who does the drawings of the various cartoon characters[,] seems to lack a comic technique and quality in his work; especially in his main character, DICK DEADEYE. * * * It is difficult to understand who the potential audience would be for DICK DEADEYE. * * * Mr. Madden concluded that the film might generate total theatrical rentals of $20,000 but that the rentals would be exceeded by the costs of advertising and distributing the film, thus resulting in a distribution loss. The Commissioner's second expert witness was Robert M. Newgard. Mr. Newgard had extensive experience in the distribution of motion pictures to television. He appraised the value of "Dick Deadeye" with respect to television *642 (including network, syndication, and cable) and ancillary markets in December 1975. In his opinion, the film's owners could anticipate revenues of only $40,000 from all such sources. Specifically, he determined that the film would derive no revenues from network television sales because of its weak box office performance, short running time, and "its total lack of quality. " In this respect, his opinion coincided with that of Mr. Cobe, who testified that networks would not touch the film after its poor opening at the Mann Bruin Theater. Mr. Newgard anticipated that syndicated television sales might return net revenues of $30,000, while basic cable television "would have little interest because of the quality." As "pay" television, such as Home Box Office, was only in its infancy in 1975, very little, if any, return could have been expected from that source. Finally, in Mr. Newgard's opinion, the return from all ancillary markets (airlines, mining camps, tuna boats, armed forces, etc.) would not exceed $10,000. Although Mr. Newgard did not value the film in terms of its purchase price between buyer and seller, it is clear that the film's fair market value with respect to all television *643 and ancillary rights would have been something less than the $40,000 net revenue which its owners could anticipate receiving. The petitioners have presented no expert testimony with regard to the film's value. Furthermore, no expert, independent valuation was secured by Mr. Smith or Mr. Code prior to or after its acquisition by the partnership. Mr. Smith testified that he relied solely upon Mr. Cobe's opinion that the film could generate gross box office revenue of up to $10 million. Mr. Code testified that he felt the film to be worth $3 million in 1975, but he also suggested that the gross box office of $10 million would have been achieved only if the film had been distributed by a major distribution company, such as MGM. We are convinced that the purchase price was determined without a true regard for the profitability of the film.The film's "disastrous" London opening prior to its sale to the partnership was a strong indication that the film would not do well in the American market. Mr. Cobe knew of the poor opening and also knew that Mr. Rost was unable to find another distributor for the film. Yet, Mr. Cobe and Mr. Ellsworth agreed to set up the partnership and, along with *644 Mr. Smith, obligated the partnership to pay $2,980,000 for the film in addition to very substantial royalties. Mr. Smith testified that he and Mr. Cobe made projections of gross box office receipts which indicated that the film would eventually return a profit to the partnership. However, even under a "best case" scenario of box office receipts of $10 million, the partnership would not have been able to pay off the nonrecourse note given to Calendula after paying for the advertising and distribution expenses required to achieve a $10 million box office. The parties to the purchase negotiations were not genuinely concerned about whether the partnership could pay off the note or make a profit. Mr. Code, Mr. Ellsworth, and Mr. Smith--none of whom invested any money in the partnership--would receive distribution, legal, and management fees up front and without regard to whether the partnership made a profit. Mr. Rost, whose "back was beginning to break" from his unsuccessful efforts to find a distributor, knew IRC was his last resort. The record reveals that there were arm's length negotiations between the seller, Calendula, and the partnership only as to the amount of the cash downpayment. *645 As to the balance of the purchase price, consisting of nonrecourse debt, the parties were willing to make it as great as the partnership desired; Mr. Rost's recollection of the negotiations on this point is most revealing: [Kantor] and Cobe talked on the phone and discussed the price and I threw my 2 cents in and I am sure that there were a whole lot of different inputs by different people who suggested what the price should be. You see, ordinarily the seller would want to get the highest price possible and the buyer the lowest price possible. In this instance, it seemed to be to everyone's advantage to have the price as high as possible. The seller, because if the film makes it, he wants to get as much as he can out of it, * * * and the buyer because of the amortization aspect of the tax thing, which I now understand. So, it wasn't too difficult for them to reach a decision. I don't even know to this day exactly what the figure was. Mr. Rost's refreshingly frank description of the negotiations also reflects what he had been told earlier by Mr. Cobe--that the partnership was formed only to provide distribution funds to IRC and tax benefits to the members of the partnership. We *646 shall now consider the relevant factors contained in section 1.183-2(b) of the regulations. There is ample evidence that the activities of the partnership were not conducted in a businesslike manner. One important indicator of this fact is that the partnership entered into a distribution contract with a corporation of which the partnership's chief promoter, Mr. Code, was president. Under the terms of the contract, IRC was to receive a cash payment of $100,000 in addition to a distribution fee of 50 percent of the adjusted gross receipts from the film's theatrical distribution and 60 percent of the adjusted gross receipts from its television distribution. This fee was unusually high; normally, a distributor would receive a 50 percent fee only if it were making a cash advance of estimated box office revenue to the producer or owner of the film. Here, the partnership not only did not receive an advance from IRC, but it was obligated to pay IRC $100,000. The film's distribution also reveals that the partnership was not operated in a businesslike fashion. The film opened in Westwood, Calif., at the Mann Bruin Theater, during one of the lowest grossing weeks of the year, the week before *647 Christmas. Mr. Cobe knew it was a poor week to exhibit a film. His explanation that this week was selected in order to qualify the film for Academy Award consideration is unpersuasive. He acknowledges that he did not bother to inquire whether there was an award category for full-length, animated films, and in fact, there was no such category. Moreover, to qualify for an Academy Award, a film need only play for one week, anytime during the year, in any theater in the Los Angeles area. The more likely explanation for the film's opening in a poor week is that the film had to be placed in service before the end of the year for the partnership to depreciate the film that year. This tax motivation is reflected in both the private offering memorandum and the distribution agreement. Both documents specifically refer to the fact that IRC had warranted that it would release the film by the end of 1975, and in the distribution agreement, time is "of the essence" with respect to this duty. However, neither document makes any reference to Academy Award considerations. By releasing the film in an historically low grossing week, IRC further reduced the likelihood that the film would ever *648 be a success. It is accepted industry knowledge that the opening of a movie is critical to its future success and that 75 to 80 percent of a film's total box office receipts are earned in the first year of distribution. After the poor opening at the Mann Bruin, the film was not exhibited again until May 22 and May 30, 1976, at midnight showings in a "cult film" theater in Seattle, Wash.After deducting advertising expenses, these two playdates generated gross film rentals of only $103.50. More than a year passed before the film was again released, at a loss, in Springfield, Mo., and in Springfield and Eugene, Ore. Thereafter, IRC made no effort to secure exhibitors; the film was merely "allowed" to play wherever anyone requested it, usually for a flat rental of $50 to $150 per showing. The film has earned total theatrical film rentals to the time of trial of $2,086.82. Even Mr. Cobe has admitted that a film cannot be distributed in this manner and earn a profit. The distribution of the film did not reflect a method of distribution recognized in the motion picture industry as calculated to maximize the box office revenues of a film. [9] Despite IRC's haphazard and totally ineffectual *649 distribution of the film, Mr. Smith made no effort in 1976 to encourage IRC to greater efforts or to change distributors. It is apparent that Mr. Smith devoted almost no time at all to the activities of the partnership. He described his duties as general partner as having to receive distribution reports from IRC, to report to the limited partners, and to "ride herd" on the progress of the film. However, his actions in "riding herd" on the film's progress can hardly be described as "businesslike." In his own words, he merely listened to what Mr. Cobe reported over the telephone and responded "Fine" or "Good." Mr. Smith's conduct is in sharp contrast to that of Mr. Rost, who made repeated efforts in 1976 and 1977 to spur IRC into distributing the film more vigorously. Another important indication of unbusinesslike behavior, as well as lack of profit motive, is that Mr. Code continued to arrange *650 the sale of units in the partnership even after it must have been obvious to the most optimistic investor that this partnership could not make a profit. The bulk of the partnership units were sold after the Mann Bruin opening but before the end of 1975. The poor opening alone would have given serious pause to a knowledgeable investor seeking a profit. Nevertheless, several additional units were sold in December 1976, despite the film's disastrous distribution record prior to that date. These investors and the partnership which encouraged their investment must have anticipated that the investors would receive only tax benefits in return for their money. Among the other factors relevant to our section 183 inquiry is the lack of expertise of the general partner, Mr. Smith, and the distributor, IRC. See sec. 1.183-2 (b)(2), Income Tax Regs. Mr. Smith, an attorney, had no experience in the entertainment industry when he agreed to become general partner. He deferred completely to Mr. Code in all matters relating to the film's distribution.Mr. Cobe, who had little, if any, experience in domestic theatrical distribution in 1975, handled only foreign distribution for IRC. Mr. Baughn *651 was in charge of IRC's domestic distribution; yet, his experience before 1975 primarily consisted of theatrical distribution in only the western United States, and he had no experience in television distribution. It is also significant that before IRC agreed to distribute the film, other more experienced distributors had refused to take on the film for Mr. Rost. The final two factors listed in the regulations that are of significance to this case [10] are: (1) The fact that the other limited partnerships organized by Mr. Cobe and Mr. Ellsworth, and of which Mr. Smith was general partner, apparently never produced an economic profit, [11] and (2) the partnership's record of losses. From 1975 through 1977, the partnership reported income of only $258. The partnership reported losses in 1975 of $72,166, in 1976 of $789,999, and in 1977 of $586,068. Although its returns for 1978 through 1980 are not available, Mr. Smith has testified that the partnership had no income in such years. A record of such large losses over such years is persuasive evidence that the partnership did not intend to make a profit. See Brannen v. Commissioner,78 T.C. at 512; Golanty v. Commissioner,72 T.C. at 427. *652 Based on the entire record, we conclude that the petitioners have failed to sustain their burden of proving that Dick Deadeye, Ltd., was engaged in the ownership and distribution of the movie for profit. Since the partnership's activity is not one for which deductions are allowable under section 162, the activity constitutes one "not engaged in for profit" as defined in *653 section 183(c). Accordingly, the petitioners' deductions attributable to such activity are subject to the limits of that section. Applying section 183(b), we conclude that the partnership had no income in 1975 and 1976; that is, it had neither a profit nor a loss. Therefore, the petitioners have no distributive share of income or loss from Dick Deadeye, Ltd., in those years. The Commissioner has also disallowed the petitioners' claimed investment tax credit for the film on the ground, among others, that the partnership was not an activity engaged in for profit.Section 48(a) as in effect during 1975 limits the availability of the investment tax credit under section 38 to "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life * * * of 3 years or more." Depreciation deductions are allowable only with respect to property which is used in a trade or business or held for the production of income. Sec. 167(a). As we have already discussed, the presence of a profit motive is essential to the existence of a trade or business ( Hirsch v. Commissioner,315 F.2d at 736; Brannen v. Commissioner,78 T.C. at 501 and n. 7; *654 Hager v. Commissioner,76 T.C. at 784), and such a motive is obviously required for property to be held for the production of income (see Fox v. Commissioner,80 T.C. at 1006; Mitchell v. Commissioner,47 T.C. 120, 128-129 (1966)). We have already determined that Dick Deadeye, Ltd., did not acquire and distribute the film with the intention of making a profit. Consequently, we conclude that the petitioners are not entitled to claim an investment tax credit with respect to the film. Cf. Wildman v. Commissioner,78 T.C. 943, 953-954 (1982). [12]
In light of our disposition of this case, we find it is unnecessary to discuss the other grounds advanced by the Commissioner in support of the disallowance of the petitioners' deductions and tax credit. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Ernest G. DeGraw and Nadine DeGraw, docket No. 16237-81; L. Milton Anderson and Elizabeth L. Anderson, docket No. 16256-81; Edwin M. Herzog and Rochelle A. Herzog, docket No. 31035-81; William D. McCullough and Linda McCullough, docket No. 12145-82; Ludwig Pazdernik and Liselotte Pazdernik, docket No. 22721-82; and Donald H. Dies and Marian A. Dies, docket No. 24397-82.↩
2. The entity or entities represented by Mr. Kantor were referred to by Mr. Rost at various times as "the Kantor group," "Frosting Service Co.," and "Calendula." The record before us does not reveal the relationship or distinction (if any) between these entities. For purposes of convenience, and for lack of better information, we will treat them as a single entity entitled Calendula, Ltd. Furthermore, the entity which sold its film rights to Dick Deadeye, Ltd., was "Calendula, Ltd." ↩
3. The "negative cost" of a film is the sum of all actual costs incurred in the production of the final negative, including all "above the line" expenses (such as salaries to producer, director, and actors, cost of script, music, and completion bond), and "below the line" expenses (such as the cost of travel, meals, insurance, salaries to technical staff, film, film processing, accounting, legal fees, and normal overheads).
4. This should probably read "General Partner." ↩
5. The reference to footnote (3) appears to have been inadvertently omitted from the text of the private placement memorandum.↩
6. The term "gross rentals" refers to amounts due to IRC after subtracting co-op advertising but prior to deducting subdistributor fees, shipping expenses, and other miscellaneous expenses. "Co-op advertising" is advertising which is paid for by both the distributor and the exhibitor to promote the film in the exhibitor's locale.The use of parentheses around a figure denotes a loss caused when co-op advertising expenses exceed the film rentals due IRC from the exhibitor.↩
7. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
8. Although the petitioners mention sec. 212 in their discussion of sec. 183, it is clear to us that the partnership and the petitioners regarded the movie as property used in a trade or business. The petitioners claimed their pro rata share of the loss reported on the partnership return of income for the years in issue rather than separately accounting for any share of sec. 212 expenses as provided in sec. 1.702-1(a)(8)(i), Income Tax Regs.↩ Moreover, on brief, the petitioners have consistently maintained that the distribution expenses were ordinary and necessary business expenses.
9. Although the film eventually generated pay television revenues to IRC fo $15,016.88 in 1981, none of these revenues was received by the partnership. Furthermore, pay television revenues were not anticipated by the promoters of the partnership in 1975 because there was then no pay television market.↩
10. The petitioners contend that a factor to be weighed in their favor is the fact that the activities of the partnership involved no elements of personal pleasure or recreation. While it is true that sec. 183 was enacted primarily to limit the deductibility of losses incurred in hobbies ( Dunn v. Commissioner,70 T.C. 715, 719 (1978), affd. 615 F.2d 578 (2d Cir. 1980)), and it is clear that the losses deducted by the petitioners were not related to a hobby, this Court held in Jasionowski v. Commissioner,66 T.C. 312 (1976), that the existence of a hobby was not a prerequisite to the application of sec. 183↩. 11. The record clearly shows that most of such partnerships never earned a profit. Although the record is not clear with respect to one of the partnerships, there is no evidence that it did in fact earn a profit.↩
12. Ziegler v. Commissioner,T.C. Memo. 1984-620↩.